UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK          FOR ONLINE PUBLICATION ONLY
-------------------------------------------------------------- X
JAMES WEBB,                                          :
                                                     :
                              Petitioner,            :
                                                     :          MEMORANDUM
              - against -                            :          AND ORDER
                                                     :
JAMES J. WALSH, Superintendent,                      :          02-CV-6629 (JG)
                                                     :
                              Respondent.            :
-------------------------------------------------------------- X

A P P E A R A N C E S :

              JAMES WEBB
                     Inmate Number 98-A-0263
                     Sullivan Correctional Facility
                     P.O. Box 116
                     Fallsburg, New York  12821
                     Petitioner *Pro se*

              CHARLES J. HYNES
                     District Attorney
                     Kings County
              By:    Anthea H. Bruffee
                     Assistant District Attorney
                        of Counsel
                     Attorney for Respondent

JOHN GLEESON, United States District Judge:

              James Webb petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254,

having been convicted in the Supreme Court of New York, Kings County, of four counts of rape

in the first degree, three counts of sodomy in the first degree, two counts of robbery in the first

degree, one count of attempted sodomy in the first degree, one count of robbery in the third

degree, one count of assault in the second degree, and one count of endangering the welfare of a

child.  Webb was sentenced to a total of 125 years to life, which, by operation of New York law,

is commuted to a maximum of fifty years to life.  N.Y. Penal Law § 70.30(1)(c)(iii).  Oral

argument of the petition was held by telephone conference on December 2, 2005.

For the reasons set forth below, I deny the petition.

BACKGROUND

The evidence at trial established the following. On August 17, 1995, at 3:30 a.m., Deborah Williams was walking home from a card game when she was grabbed from behind in a choke hold; her assailant pressed a sharp object to her face and forced her to the rear of Public School 20 in the Fort Greene / Clinton Hill section of Brooklyn, where he raped and sodomized her. The assailant took the cash Williams had on her and a box cutter and left, telling Williams to stay put and count to a hundred. Later that day, Williams was treated at Brooklyn Hospital Center; serological testing on her underwear returned positive for the P-30 antigen, which is present in all semen samples, but little or no spermatazoa were found. Williams described her attacker as a dark-skinned black male, with a low "Afro" hairstyle, approximately five feet eight inches tall, about forty-five years old, and a gap between his front teeth.

On November 14, 1995, at 6:30 p.m., 16-year-old Erica South was walking home from school near P.S. 20 when she was grabbed from behind by the neck, choked, and told to "shut up, shut the fuck up." Tr. 433, 435.[1] Her assailant forced South down to the same landing behind P.S. 20 where Williams was raped, and there he raped and sodomized South in similar fashion. South was treated at Brooklyn Hospital Center, and although the vaginal swab tested positive for the P-30 antigen, no spermatazoa was present. South gave a description of her attacker similar to the one Williams gave.

A week later, on November 21, 1995, Lena Jones was choked from behind while

---

[1] "Tr." refers to the pagination of the trial transcript. "H. Tr." refers to the continuous pagination of the transcripts from the several pre-trial hearings.

2

she was walking on Washington Avenue in Fort Greene / Clinton Hill. Jones's attacker dragged her into some bushes near an abandoned hotel, telling her to "shut the fuck up, don't say anything," Tr. 617; he got on top of her, choking her, and scratched her across the face. Fortunately, Jones struggled continually and managed to get away, and when Jones fled, her attacker took her unisex leather coat. Jones described her assailant to the police as a dark-skinned black man in his forties with a large gap between his teeth.

On November 27, 1995 at 10:15 p.m., Denise Chapman was walking along Washington Avenue in Fort Greene / Clinton Hill. She was approached from behind and choked, told to "shut the fuck up," and dragged into a park below street level in the P.S. 11 schoolyard. As with the other victims, the assailant forced Chapman to take off only one leg of her pants, making it impossible for her to run with any speed. When Chapman tried to get away, she tripped on her own clothing. The attacker put a box cutter to her face, and threatened to kill her if she tried to run again. The man then stole her jewelry, raped her, and sodomized her. Chapman was treated at Woodhull Medical Center, and serological testing revealed the presence of the P-30 antigen, without spermatazoa.

On December 4, 1995, Tanya Freeman left her boyfriend's house and was walking in Fort Greene / Clinton Hill when she was approached from behind and grabbed by the arm, a hard object poked into her back, and told to just walk and that she would not be hurt. After six or seven blocks, the man put Freeman in a choke hold and dragged her into an abandoned building, where he raped and sodomized her. Afterward, Freeman's attacker became concerned that he could not find his wallet, and said that he would set the building on fire so as not to leave any evidence. The man started the fire and the two ran out of the building. Her

description of her assailant matched those given by the other recent victims.

Because the circumstances of these crimes created a pattern, the police worked with victims South and Chapman to create a composite sketch. James Webb had very recently been released from prison, and when his parole officers saw the sketch, they contacted the detectives working the case. South was then shown a six-person photo array containing Webb's picture, but she did not identify him. Jones was shown the same array, and she identified the defendant. The police then brought Webb in for a lineup and, one by one, the five victims independently identified him as their attacker. The victims had no contact with any of the fillers or with each other before viewing the lineup. When South saw the lineup, she immediately identified the defendant to the detective; she then asked the detective if each of the individuals could stand up and say, "Shut up. Shut the fuck up." When Webb did so, South began to cry: "Oh my God, that is him." H. Tr. 34-35, 384.

Because the medical evidence collected from the victims suggested the rapist was ejaculating semen but not spermatozoa, the prosecutor sought the court's permission, which was granted, to perform a medical examination of Webb and to retrieve reference samples of saliva and blood for forensic testing. Shortly thereafter, the D.A.'s office issued a subpoena for Webb's prison medical records. The subpoenaed material was improperly sent to the D.A.'s office, rather than to the court, as it should have been. The prosecutor did not secure a waiver of the doctor-patient privilege before receiving Webb's medical records.

The medical examination, as well as Webb's medical records, revealed that Webb suffered from bilateral undescended testicles, a congenital condition resulting in azoospermia, that is, the capacity to produce semen but not spermatozoa. This condition does not affect the

ability to have and maintain an erection. Webb moved to suppress the evidence from both sources, but the trial court granted it only as to his medical records. The physical examination, the trial court ruled, having been sought before the subpoena was issued, constituted an independent source for the evidence and therefore should not be suppressed.

Webb also moved the trial court to suppress the identifications from the lineup on the ground that the lineup was unduly suggestive. The court denied his motion, and each of the victims made in-court identifications of him at trial.

Forensic medical evidence collected from three of the victims -- Williams, South, and Chapman -- was introduced against Webb; no such evidence was introduced by the prosecution with respect to Tanya Freeman, who testified she had engaged in consensual sex with her boyfriend at his house shortly before she left on the night she was raped. Because the semen samples contained no sperm, however, the DNA testing now typical in rape cases was impossible; the methods employed were those used prior to DNA testing, based upon the ABO blood types and the GM and KM markers. With respect to the semen sample collected from Williams, the forensic testing showed that Webb's reference samples were consistent with him being the donor and that the probability of another member of the African-American community, chosen at random, being the donor was 1 in 500. Webb's reference samples were also consistent with him being the donor of the semen samples collected from South and Chapman, with the probability of a random member of the African-American community being the donor of those samples 1 in 30 and 1 in 60, respectively.

After a lengthy trial, the jury returned verdicts of guilty as to all five victims, although Webb was acquitted on the charge of robbery of Deborah Williams.

Webb appealed, and he was appointed new counsel to assist him. When appellate counsel advised Webb he intended to raise only one issue in his brief -- that the trial judge improperly denied Webb's challenges for cause against two prospective jurors who were police officers -- Webb sought new counsel. That request was denied, but Webb was allowed to submit a supplemental brief pro se, in which he raised numerous other claims. The Appellate Division affirmed his convictions, denying all of Webb's claims on the merits. *People v. Webb*, 728 N.Y.S.2d 402 (2d Dep't 2001). On December 18, 2001, the New York Court of Appeals denied Webb's application for leave to appeal the Appellate Division's decision. *People v. Webb*, 97 N.Y.2d 689 (2001).

On December 11, 2002, Webb filed a pro se motion in the state trial court to vacate his conviction, and the next day he petitioned this court for a writ of habeas corpus. Because Webb's habeas petition contained claims Webb had not exhausted in state court, upon consent of the parties, this court stayed consideration of the petition and held it in abeyance pending Webb's exhaustion of all his claims in state court. On May 21, 2004, the state trial court denied Webb's motion to vacate his conviction, *People v. Webb*, 2004 WL 1152748 (2d Dep't 2004) (Gerges, J.) (unpublished disposition)[2], and on November 12, 2004, Webb moved the Appellate Division pro se for a writ of error coram nobis claiming ineffective assistance of appellate counsel. The Appellate Division denied that motion on February 14, 2005, *People v. Webb*, 789 N.Y.S.2d 432 (2d Dep't), and the Court of Appeals denied leave to appeal on May 9, 2005, *People v. Webb*, 4 N.Y.3d 892. Webb then submitted amended petitions to this court on

---

[2] Webb claims in his petition to have sought review of this decision, but neither he nor the respondent cite to the decision denying it.

May 30 and June 13, 2005, renewing his application for a writ of habeas corpus. On June 27, 2005, I lifted the stay on Webb's petition.

DISCUSSION

A.    The AEDPA Standard

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits. *See* 28 U.S.C. § 2254(d). Under the AEDPA standard, the reviewing court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1) & (2). The Supreme Court has interpreted the phrase "clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established Supreme Court law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id*. "In other words, a

federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63 (2003)).

Under the "unreasonable application" standard set forth in *Williams*, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist*, 260 F.3d at 93 (citing *Williams*, 529 U.S. at 411); *see also Yarborough v. Gentry*, 124 S. Ct. 1, 4 (2003) (per curiam) ("Where . . . the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable."); *Wiggins*, 539 U.S. at 520-21 (same). Interpreting *Williams*, the Second Circuit has added that although "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Gilchrist*, 260 F.3d at 93 (citing *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

This standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether it has alluded to federal law in its decision. As the Second Circuit stated in *Sellan v. Kuhlman*:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S. C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

261 F.3d 303, 312 (2d Cir. 2001).

B.    Exhaustion

         Before a federal court may consider a state prisoner's petition for a writ of habeas

corpus, the petitioner must have exhausted all available state judicial remedies.  28 U.S.C.

§ 2254(b); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  In order to exhaust his state remedies, a

petitioner must have fairly presented his federal constitutional claims to the highest state court.

*Daye v. Attorney Gen.*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc).  A petitioner has fairly

presented a claim if he or she apprised the state courts of "both the factual and the legal premises

of the claim [the petitioner] asserts in federal court."  *Id.*  Even if a petitioner raises precisely the

same legal claims in state and federal proceedings, reliance in the two proceedings upon

different factual grounds that fundamentally alter the legal claim will foreclose a conclusion that

the claim is exhausted.  *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *see also Jones v. Keane*,

329 F.3d 290, 294-95 (2d Cir. 2003) ("A petitioner has 'fairly presented' his claim only if he has

informed the state court of both the factual and the legal premises of the claim he asserts in

federal court." (quotation marks omitted)).  In other words, the claim presented to the state court

"must be the substantial equivalent of the claim raised in the federal habeas petition."  *Id.* at 295

(quotation marks omitted).  Furthermore, "the basic requirement remains that 'the nature or

presentation of the claim must have been likely to alert the court to the claim's federal nature.'"

*Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) (quoting *Daye*, 696 F.2d at 192).

         When a habeas petition contains both exhausted and unexhausted claims (a so-

called "mixed petition"), the petition ordinarily must be dismissed unless the petitioner (1) meets

the criteria for a "stay and abeyance" while the petitioner exhausts his claims in state court, or

(2) agrees to delete the unexhausted claims. *See Rose v. Lundy*, 455 U.S. 509, 522 (1982);

*Rhines v. Weber*, 125 S.Ct. 1528, 1535. A "stay and abeyance is only appropriate when the

district court determines there was good cause for the petitioner's failure to exhaust his claims

first in state court," but should never be granted "when [the] unexhausted claims are plainly

meritless." *Rhines*, 125 S.Ct. at 1535. When a "stay and abeyance is inappropriate," the district

court will "allow the petitioner to delete the unexhausted claims if dismissal of the entire petition

would unreasonably impair the petitioner's right to obtain federal relief." *Id*. Finally, the district

court has discretion to deny a petition that contains both exhausted and unexhausted claims on

the merits. 28 U.S.C. § 2254(b)(2).

C.      Webb's Unexhausted Claims

             As discussed below, Webb's petition contains a wealth of exhausted claims; even

after the stay and abeyance, however, Webb's amended petition contains new and unexhausted

claims. Further, in a 50-page "Affidavit in Response" to the respondent's opposition papers,

Webb adds still more claims, most of them alleging a massive conspiracy against him to alter the

record in his case, including the state judges and even his own trial and appellate attorneys:

"Petitioner states that everything he has said to [the court] that is not supported by the records is

because the official records has been tempered [sic] with in every possible way." Petitioner's

Affidavit in Response at 9. Webb did move the Appellate Division to resettle the record in his

case, which motion was denied. To the extent Webb intends the conspiracy he now alleges to

constitute a claim that the Appellate Division's denial of his motion to resettle the record denied

him his rights under the federal constitution, such a claim is exhausted, but is now denied. To

the extent Webb's other claims are unexhausted, the court denies them pursuant to 28 U.S.C.

10

§ 2254(b)(2).

D.  Webb's Exhausted Claims

      1.  *Ineffective Assistance of Trial Counsel*

      The Supreme Court has established the following standard for ineffective

assistance claims:

> First, the defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that counsel
> was not functioning as the "counsel" guaranteed the defendant by the
> Sixth Amendment.  Second, the defendant must show that the deficient
> performance prejudiced the defense.  This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial, a trial
> whose result is reliable.  Unless a defendant makes both showings, it
> cannot be said that the conviction . . . resulted from a breakdown in the
> adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Thus, to make out this type of claim, the

petitioner must demonstrate both (1) that his attorney's performance "fell below an objective

standard of reasonableness," *id*. at 688, and (2) that "there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different," *id*.

at 694.  In assessing the reasonableness of counsel's performance, judicial scrutiny "must be

highly deferential," and the court must "indulge a strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance; that is, the defendant must

overcome the presumption that, under the circumstances, the challenged action might be

considered sound trial strategy."  *Strickland*, 466 U.S. at 689 (internal quotation marks omitted);

*Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998).

      To establish the requisite effect of counsel's performance on the outcome of the

proceeding, it is not sufficient if the petitioner shows merely that counsel's errors had "some

conceivable effect" on the outcome.  *Strickland*, 466 U.S. at 693.  Rather, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."  *Id*.  This determination, unlike the determination whether counsel's performance fell below an objective standard of reasonableness, may be made with the benefit of hindsight.  *See Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

Webb argues his trial attorneys were ineffective on numerous grounds, including, first, that they failed "to put exculpatory evidence before the jury."  As examples of such evidence, Webb offers a laboratory test result from semen samples taken from Tanya Freeman, indicating that Webb was excluded as the donor of the sample.  In light of Freeman's testimony that she had sex with her boyfriend shortly before she was raped, these results are unsurprising and do not indicate, as Webb contends, his "actual innocence."

Likewise, Webb points to a DNA analysis on the semen sample taken from Erica South.  The report shows that "the DNA profiles obtained from the vaginal swab ... are consistent with the DNA profile from Erica South ....  There was no DNA foreign to the victim detected ...."  Far from exculpatory, this evidence tends to prove that the donor of the semen, like Webb, suffered from azoospermia.  As Dr. Moses Schanfield testified, "under normal circumstances, when there is sperm, it is virtually impossible to detect the DNA from th[e] ... donor."  Tr. 1025.

Webb also contends his attorneys should have obtained his "release photographs" from the Orleans Correctional Facility, which would have shown he "did not fit the description of the alleged perpetrator"; that is, the photographs would have shown him with a beard on the

day he was released, August 15, 1995, two days before the first rape occurred, the perpetrator of which was described as clean shaven.[3]  Putting aside the patent flaw in this argument (i.e., it does not take more than two days to shave a beard), as the trial judge noted in denying Webb's motion to vacate his conviction, "informing the jury that the defendant had been released from prison two days before the crime ... [was] something defense counsel assiduously tried to prevent," and with some success.  *People v. Webb*, 2004 WL 1152748.  Indeed, Webb's attorneys successfully precluded the prosecution from introducing "evidence that the sneakers worn by the perpetrator and a bag used in one of the attacks were of the kind given prisoners released from State prison," as well as evidence that Webb "had been previously convicted of a sex crime with the identical modus operandi as those being tried," and had persuaded "the People (after a lengthy hearing) not to call a jail house informant to whom the defendant made inculpatory statements."  *Id*.

      None of Webb's arguments that his trial lawyers were ineffective, including those not mentioned here, is persuasive in the least.  Indeed, a review of the pre-trial and trial transcripts indicates that Webb had the benefit of two zealous and articulate advocates at every step of the way.  The various arguments Webb now claims his lawyers should have made would largely have been to his detriment in the eyes of the jury, and his lawyers were not constitutionally ineffective for not raising them.

      2.  *Ineffective Assistance of Appellate Counsel*

      Although the Supreme Court formulated the *Strickland* test in the context of examining a claim of ineffective assistance of trial counsel, the same test applies to claims

---

[3]Another of Webb's similarly misinformed theories of ineffective assistance is that counsel failed to make the argument that because one of the victims is HIV positive and Webb is not, he could not possibly be the person who committed the rape, which was alleged to be without a condom.

regarding the performance of appellate counsel.  *See Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994); *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992).  Appellate counsel need not present every nonfrivolous argument that could be made.  *See Mayo*, 13 F.3d at 533 (citing *Jones v. Barnes*, 463 U.S. 745, 754 (1983)); *see also Evitts v. Lucey*, 469 U.S. 387, 394 (1985) (emphasizing that appellate counsel "need not advance every argument, regardless of merit, urged by the appellant").  Moreover, reviewing courts should not employ hindsight to second-guess an appellate attorney's strategy choices.  *See Mayo*, 13 F.3d at 533 (citing *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)).  A petitioner, however, may establish constitutionally inadequate performance if he shows that his appellate counsel omitted material and obvious issues while pursuing matters that were patently and significantly weaker.  *Cf. Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998) ("[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy.").

Webb argues his appellate counsel was ineffective by choosing to present only one issue to the Appellate Division, namely, Webb's contention that the trial court erred in rejecting the defense's challenges for cause of two prospective jurors who were police officers. As Webb's appellate counsel patiently explained to him in a letter:

> Raising this one issue is a strategic decision.  The facts of your case are not attractive .... [and] given the amount and variety of the evidence in your case, it is my judgment that the Appellate Division is likely to find any error at trial to have been harmless ....
>
> Instead, the error that I have found is per se reversible; that means that harmless error does not apply.  The claim has the added benefit of not requiring any extended discussion of the evidence against you, because any judge reading an extended discussion of those facts will not want to reverse your conviction.
>
> You raise several issues in your letter ....  I have considered those

14

> issues, and I have decided not to raise them because, in my judgment, they have no chance of success ....  I do not see any decent <u>Brady</u> claim in your case.  Finally, your trial attorneys were superb.  There is as much chance of your winning an ineffective assistance of counsel claim against your attorneys as there is of your being chosen the next Warden of Sullivan Correctional Facility.

As noted above, Webb disagreed and filed a 70-page, single-spaced supplemental brief pro se (objecting that he was not allowed to file a longer brief), raising no less than 15 additional claims of error.

I conclude Webb's appellate attorney's strategy was a sound one, especially in light of the overwhelming evidence of Webb's guilt.  Indeed, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues ....  A brief that raises every colorable issue runs the risk of burying good arguments .... in a verbal mound made up of strong and weak contentions."  *Jones*, 463 U.S. at 751-53.  Webb's appellate counsel did not render constitutionally ineffective service by heeding this advice in a particularly appropriate case.

### 3.  *Challenges to Jurors for Cause*

Webb raises here the argument his appellate counsel did put forward -- that the trial court erred in rejecting the defense's challenges for cause of two prospective jurors who were police officers.  Webb's argument rests on statements by these prospective jurors that they did not personally know of police officers who have lied on the witness stand.  As the prosecution pointed out on direct appeal, the "apparent assumption is that police officers generally commit perjury and that if a police officer / potential juror does not personally know of an officer who lies on the stand then that potential juror, in turn, must be lying."  Br. of Appellee

at 38.  To the extent this claim presents a federal question, upon reviewing the voir dire record, I

agree with the Appellate Division, which concluded "[n]othing was said by these jurors which

demonstrated that they would not be able to render an impartial verdict, and thus, the trial court

providently exercised its discretion in denying the defense counsel's challenges."  728 N.Y.S.2d

402.  The Constitution of the United States does not require states to exclude police officers from

jury service, and these two officers affirmatively stated that they could render a fair and impartial

verdict.  The trial court was in the best position to evaluate the officers' credibility, and nothing

in this record provides a basis for concluding the court's decision to believe them is unworthy of

deference.

### 4.  *Motion to Suppress the Physical Exam*

Webb contends the trial court erred in permitting the prosecution to introduce the

medical evidence it obtained through the physical exam of him, including that Webb has

azoospermia, because the prosecution improperly accessed his medical records without obtaining

a waiver of the doctor-patient privilege.  Even assuming a violation of that state-law privilege

gives rise to a remedy of suppression under the federal Constitution, Webb's claim of

suppression was properly denied by the trial court, as the Appellate Division held, 728 N.Y.S.2d

402, under the "independent source" doctrine, which holds:

> [T]he interest of society in deterring unlawful police conduct and the public
> interest in having juries receive all probative evidence of a crime are properly
> balanced by putting the police in the same, not a worse, position that they would
> have been in if no police error or misconduct had occurred.... When the
> challenged evidence has an independent source, exclusion of such evidence
> would put the police in a worse position than they would have been in absent any
> error or violation.

*Nix v. Williams*, 467 U.S. 431, 443 (1984).  Webb's numerous claims that the trial court erred by

allowing the prosecution's "theft" of his medical records to go unpunished are thus at odds with Supreme Court precedent, and are, in their various forms, denied.

Additionally, Webb complains that he was entitled to be present while the legal argument on this point was taking place. A defendant is "guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). The "privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a shadow,'" *Id.*, quoting *Syder v. Mass.*, 291 U.S. 97, 106-07 (1934). The legal argument over whether the prosecution had an independent source for the medical evidence Webb sought to suppress was just such a moment; in general, a criminal defendant has no right to be present at proceedings that involve purely legal argument. *See* Fed. R. Crim. Pro. 43(c)(3) (defendant need not be present when "proceeding involves a conference or hearing on a question of law"). Webb's claim is therefore without merit.

5. *Motion to Suppress the Lineup Identifications*

Webb argues the lineup in which all five victims identified him was unduly suggestive and therefore inadmissible. The framework for evaluating the propriety of a lineup is as follows:

> When the defendant objects to identification testimony to be given by a witness who has identified him prior to trial, a sequential inquiry is required in order to determine whether either the prior identification or an in-court identification of the defendant at trial is admissible. The court must first determine whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator .... If the procedures were not suggestive, the identification evidence presents no due process obstacle to admissibility, *see, e.g., Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir.1986); no further inquiry by the court is required, and "[t]he reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury," *Foster v. California*, 394 U.S. 440, 442 n. 2 (1969). If the court

17

finds, however, that the procedures were suggestive, it must then determine whether the identification was nonetheless independently reliable .... In sum, the identification evidence will be admissible if (a) the procedures were not suggestive or (b) the identification has independent reliability.

*Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001).

Webb argues he stood out from the rest of the individuals in the lineup because of his clothing. At the lineup, Webb was wearing blue jeans, white sneakers, and a dark hooded sweatshirt. As the trial court concluded, however, from viewing a photograph of the lineup, Webb was not the only participant in the lineup wearing such attire. Although there is no such picture in the record on habeas review, Webb has offered no credible evidence that the trial court's ruling was incorrect. In any event, taking into account

[1] the opportunity of the witness[es] to view the criminal at the time of the crime, [2] the witness[es'] degree of attention, [3] the accuracy of the witness[es'] prior description of the criminal, [4] the level of certainty demonstrated by the witness[es'] at the confrontation, and [5] the length of time between the crime and the confrontation,

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), the identifications in this case showed sufficient independent reliability to survive this court's deferential habeas review.

     6. *Other Claims*

The Court has considered Webb's numerous other claims and finds them all to be without merit.

CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied. Because Webb has failed to make a substantial showing that he was deprived of his constitutional rights, *see* 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

So ordered.


John Gleeson, U.S.D.J.

Dated:      Brooklyn, New York
              December 12, 2005